UNITED STATES BANKRUPTCY COURT
FOR THE
WESTERN DISTRICT OF KENTUCKY

In re:   Lizabeth Anne Stinson

       Debtor                                    CASE NO. 05-33685

                                                          CHAPTER       7

Charles Skyles and
Margaret Skyles

       Plaintiffs

vs.

Lizabeth Anne Stinson

       Defendant                            Adv. Proc. No. 05-03210

**MEMORANDUM-OPINION**

THIS ADVERSARY PROCEEDING is before the Court after the conclusion of a trial on the merits of the cause of action brought by Plaintiffs against Defendant under 11 U.S.C. §523(a)(2)(A) and 11 U.S.C. §§727(a)(2)(A), (4)(A) and (5).  For the reasons set forth below, the Court determines that Defendant's debt to Plaintiffs is dischargeable and that Defendant is entitled to a discharge under 11 U.S.C. §727.  By virtue of 28 U.S.C. §157(b)(2)(J) this is a core proceeding. The following constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Fed. R. Bankr. P. 7052.

<u>FINDINGS OF FACT</u>

This Adversary Proceeding stems from the September 2004 loan of $18,000.00 from Plaintiffs to Defendant.  On or around September 7, 2004, Defendant visited Plaintiff Margaret Skyles, a neighbor of approximately 12 years.  Although Plaintiffs and Defendant were not close

friends and did not socialize, they were friendly, regularly exchanging small gifts at Christmas time. On that day, however, Defendant had serious matters to discuss. Defendant at that time faced dire financial circumstances. She had borrowed thousands of dollars from friends and family and had charged thousands of dollars on credit cards without telling her husband.[1] Certain of her creditors were demanding repayment and she feared that her husband ("Mr. Stinson") would find out about her theretofore concealed indebtedness.[2] To make matters worse, Defendant and Mr. Stinson were seriously discussing divorce.[3] All of this was taking place against a backdrop of Defendant having struggled with ovarian cancer since 1999 as well as back problems related to a workplace injury in 1998.[4]

Why Defendant chose to unload her troubles on a mere neighbor/acquaintance is not entirely clear, although it speaks of desperation. Defendant testified that she went to Plaintiffs' house simply looking for a sympathetic ear. She insists that she had no intention of asking Plaintiffs for money. Indeed, both parties testified that it was in fact Plaintiff Margaret Skyles who suggested loaning money to Defendant. The Court is aware, however, that a clever and/or desperate person might manipulate a generous person's emotions to elicit an ostensibly "voluntary" offer to help. Here, although Defendant apparently did not directly ask Ms. Skyles for money, she certainly gave Ms. Skyles the impression that Defendant's husband would "kill" Defendant if he found out about the debts and that Defendant would have to kill herself if she did not find a way to pay them back. In any event, on September 7, 2004, Plaintiffs wrote Defendant a check from their home equity line of credit for $18,000.00.

---

[1] In fact, the Court takes judicial notice of testimony in a related Adversary Proceeding wherein it was disclosed that Defendant had obtained a private post office box address to keep her credit card accounts, and hence, bills, secret from her husband.

[2] Although it is not clear what was the total amount of Defendant's debt at the time, the Court notes that she listed $99,344.55 in unsecured debts in Schedule F accompanying her bankruptcy petition.

[3] Defendant and Mr. Stinson had, in fact, previously filed for divorce in 2001. Defendant's health, however, prevented her from pursuing the divorce at that time.

[4] As a result of her physical disabilities, Defendant receives approximately $1,145.00 monthly in Social Security disability payments.

Unfortunately, the most generous hearts are also sometimes the most naive. Plaintiffs loaned Defendant the money solely upon Defendant's verbal assurance that she could repay them out of funds she expected to receive from her father by the end of 2004. They did not require Defendant to sign a promissory note, and the parties did not create any other writing at that time memorializing Defendant's promise to repay Plaintiffs. Moreover, Plaintiffs made no attempt to verify Defendant's claim that her father was planning to give her enough money to repay them.

Plaintiffs' naivete notwithstanding, Defendant apparently had at least some reason to believe that she would receive money from her father in an amount sufficient to repay Plaintiffs. Defendant's mother had died in November of 2001. Defendant testified that, just before her mother died, the mother told Defendant and Defendant's father that she wanted the father set up trusts for their children, including Defendant. According to Defendant, Defendant and her father later discussed this and her father indicated to Defendant that he intended to give each child $25,000.00 and that he wanted to do this by the end of 2004 for tax reasons.

Despite what Defendant's father might have told Defendant, Defendant did not receive any money from her father by the end of 2004.[5] In late December 2004, she called the Plaintiffs and told them that she could not get the money to repay them until the end of January 2005. Then, toward the end of January 2005, she contacted Plaintiffs and told them that she was still unable to repay them. At this point Plaintiffs confronted Defendant with their belief that she had lied to them and that she did not intend to repay them. Defendant assured Plaintiffs that she intended to repay them and offered to sign a promissory note for the amount borrowed plus interest.

On February 8, 2005, Defendant did in fact execute a promissory note in Plaintiffs' favor, which provided for repayment of the $18,000.00 in full on or before February 13, 2005, plus interest at 5.25%.

On February 12, 2005, Defendant went to the hospital believing that she was having a heart attack. She called Plaintiffs from the hospital and told them that she did not have the money to

---

[5]According to Defendant, Defendant's widowed father developed a relationship with a woman in Texas and Defendant believes that woman discouraged Defendant's father from giving his children the promised money. Defendant testified that after her father died in March of 2006, she received only $2,500.00 from his estate.

3

repay them and that they should go ahead and discuss the matter with Mr. Stinson.[6] On February 13, 2005, Defendant called the Plaintiffs again and told them to go to her house and retrieve a letter that she had left for them. Although that letter was not produced at trial, Plaintiffs testified that Defendant stated in the letter that although Defendant understood that Plaintiffs would likely sue her to collect the debt owed to them, she still thought she would be able to repay them in April of 2005. Plaintiffs filed suit to collect the debt in Kentucky state court on February 17, 2005, and obtained summary judgment against Defendant on May 26, 2005.[7]

Defendant and Mr. Stinson filed for divorce on April 1, 2005, and their divorce became final on April 13, 2005.[8] They did not each retain independent counsel during the divorce but simply hired one attorney to act as a "scrivener." They had been married for approximately 24 years.

In their divorce, Defendant and Debtor divided their marital property by consensual Property Settlement Agreement, which was submitted to, and approved by, the Jefferson County, Kentucky, Family Court (the "Family Court"). The Property Settlement Agreement provided that Mr. Stinson would retain (1) the marital residence (the "Real Property"), which had a fair market value of approximately $270,000.00; (2) a used car business, which was valued at approximately $20,000.00 based on the value of assets on hand less company debt; (3) certain stock that had been originally purchased for $20,000.00; (4) two life insurance policies with a combined cash surrender value of approximately $18,000.00; and (5) a personal bank account with a balance of approximately $500.00. Although not expressly mentioned in the Property Settlement Agreement, Mr. Stinson also received in the divorce a hot air balloon valued at $5,000.00 and a lawn tractor valued at $2,500.00. Mr. Stinson assumed sole liability for the approximately $170,000.00 debt encumbering the Real Property, approximately $17,500.00 of Defendant's personal debt to two individuals, approximately $13,000.00 of business debt to Defendant's father, and approximately $22,000.00 of credit card debt.

---

[6]The parties agree that Mr. Stinson did not learn of Defendant's indebtedness to Plaintiffs until February 12 or 13, 2005.

[7]That judgment did not contain any findings or conclusions concerning whether Defendant had acted in a fraudulent manner toward Plaintiffs.

[8]Defendant and Mr. Stinson had already come to an agreement about the division of their marital property and memorialized the same as of January 3, 2005. They had originally planned to file for divorce in January 2005, but Mr. Stinson's father committed suicide that month.

4

Under the Property Settlement Agreement, Defendant essentially received (1) the right for three years to use a $10,000.00 automobile provided by Mr. Stinson, rent and maintenance free; (2) the right at the end of such three years to receive from Mr. Stinson a vehicle worth $10,000.00 or $10,000.00 cash; (3) the right to live at the Real Property for three years by paying Mr. Stinson $700.00 per month rent; (4) home furnishings that Defendant valued at $50,000.00[9]; and (5) a personal bank account with a balance of approximately $600.00  Defendant assumed sole liability for the approximately $100,000.00 in credit card and other personal debt that she testified that she incurred without Mr. Stinson's knowledge or approval.  Mr. Stinson and Defendant agreed that Mr. Stinson would not pay Defendant any maintenance.

Defendant filed her Chapter 7 bankruptcy petition, Statement of Financial Affairs and Schedules on May 31, 2005 (collectively, "Defendant's Bankruptcy Papers").  As Plaintiffs have pointed out, Defendant's Bankruptcy Papers contained several deficiencies.  Most notably, in Question 10 of the Statement of Financial Affairs, Plaintiff failed to state that she had transferred her marital residence to Mr. Stinson as part of their divorce.  Defendant also failed to disclose the leasehold interest that she retained in the marital home and the right to use an automobile that she obtained as part of her divorce. On the other hand, Defendant did clearly disclose her divorce proceeding and Plaintiffs' state court collection action in Question 4 of the Statement of Financial Affairs and discussed her divorce and property settlement openly at the Section 341 Meeting of Creditors and at a Rule 2004 examination held in connection with her underlying bankruptcy case.[10] Defendant also identified Plaintiffs as unsecured creditors on her bankruptcy Schedule F and provided the address of their attorney in the state court collection action.  Furthermore, Defendant testified that she gave all pertinent information to her bankruptcy attorney and that she relied upon

---

[9]Defendant testified that she placed the $50,000.00 value on the furnishings in her divorce because she estimated that it would cost her that much to replace those items if she did not receive them in the divorce.  On the other hand, she also testified that if she had to sell those items, they would only warrant "yard sale" prices, which would generate approximately $2,500.00. Defendant also placed a value of $2,500.00 on the furnishings in Schedule B of her bankruptcy petition.  The Court finds here that amount to be the true market value of the furnishings.

[10]It should be noted in particular that Plaintiff's disclosure of her divorce proceeding includes a case number indicating that the divorce case was filed in 2005.

5

him to complete the necessary paperwork correctly.[11]

Plaintiffs filed their complaint initiating this Adversary Proceeding on December 8, 2005. On March 21, 2006, Defendant's Chapter 7 Trustee initiated an Adversary Proceeding against Defendant's ex-husband, Roy Stinson. That Adversary Proceeding, however, only seeks recovery of the marital residence transferred to Mr. Stinson as part of the divorce. Notably, the Chapter 7 Trustee's action does not seek to withhold a discharge from Defendant.

## CONCLUSIONS OF LAW
### 11 U.S.C. §523(a)(2)(A) Claim

Plaintiffs seek a determination from the Court that Defendant's debt to them is non-dischargeable under 11 U.S.C. §523(a)(2)(A). To obtain an exception from discharge under 11 U.S.C. § 523(a)(2)(A), a plaintiff-creditor must prove by a preponderance of the evidence, each of the following essential elements: (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) the creditor's reliance was the proximate cause of loss. *See In re Rembert*, 141 F.3d 277, 280-81 (6th Cir. 1998). The debtor's intent is ascertained by looking at the totality of the circumstances, and all exceptions to discharge are to be strictly construed against the creditor. *Id.* at 281-282. Furthermore, the proper inquiry is whether a debtor *subjectively* intended to pay the debt, which requires a showing of actual or positive fraud, not merely fraud implied by law. *Id.* at 281. While a view to a debtor's overall financial condition is a necessary part of inferring whether or not the debtor incurred the debt maliciously and in bad faith, the hopeless state of a debtor's financial condition should never become a substitute for an actual finding of bad faith. *Id.*

The entire record in this case leads the Court to conclude that Plaintiffs' claim under 11 U.S.C. §523(a)(2)(A) must fail because Defendant did not at the inception of the loan knowingly and intentionally make a false and deceptive representation to Defendants upon which they

---

[11]Defendant is, of course, ultimately responsible for the accuracy of her bankruptcy petition, Statement of Financial Affairs and Schedules, which Defendant fully acknowledges. The Court, however, also recognizes the sad fact that in some cases not every bankruptcy attorney is as careful as he or she should be about reviewing court filings with his or her client.

justifiably relied to their detriment. That is, there was no fraud in the inducement of the loan. Without limiting the generality of the foregoing, three facts in particular serve to eviscerate Plaintiffs' claim under 11 U.S.C. §523(a)(2)(A).

First, Defendant's own testimony indicates that she subjectively believed that her father was going to give her $25,000.00 by around the end of 2004, which would have permitted her to repay Plaintiffs. She testified as to that belief and Plaintiffs provided no evidence that would undermine Defendant's credibility on this point. Such evidence might have included, for example, Defendant's father's financial records and/or testimony from other relatives or friends showing the father's inability or a lack of intention to give Defendant money.

Second, Defendant executed a promissory note to Plaintiffs months after having received the $18,000.00. This demonstrates to the Court, objectively, that Defendant really did intend to repay Plaintiffs. If Defendant had intended to defraud Plaintiffs from the beginning, she would not have signed the promissory note, which made it easier for Plaintiffs to obtain a judgment against her. In other words, if she had started out with the intention of swindling Plaintiffs, she would presumably have refused to sign the note and simply claimed that the $18,000.00 was a gift.

Third, even if Defendant lied about her father planning to give her money, the Court cannot conclude that Plaintiffs' reliance upon Defendant's statement alone was justified. Given the not insubstantial amount of money loaned, one would expect that Plaintiffs would have asked for at least some independent confirmation, such as a letter or even a phone call, that Defendant's father truly had the means and intention to give Defendant enough money to repay Plaintiffs. Yet Plaintiffs did not even ask Defendant to execute a promissory note at the time of the initial loan.

Because Plaintiffs have failed to prove that Defendant subjectively intended to deceive them, that she made any false representations, or that they justifiable relied upon any allegedly false representations, their claim under 11 U.S.C. §523(a)(2)(A) must fail for failure to carry the required burden of proof.

## 11 U.S.C. §727(a) Claims

Plaintiffs also seek a general denial of a discharge to Defendant under 11 U.S.C. §§727(a)(2)(A), (4)(A), and (5). To prevail, Plaintiffs must prove each of the elements of those sections of the Bankruptcy Code by a preponderance of the evidence. *In re Keeney*, 227 F.3d 679,

683 (6th Cir. 2000). The Bankruptcy Code should be construed liberally in favor of the debtor. *Id.*

## 11 U.S.C. §727(a)(2)(A)

Plaintiffs contend that Defendant "transferred, removed, destroyed, sold or concealed or permitted same to occur to property with intent to hinder, delay or defraud her creditors" when she agreed to the Property Settlement Agreement and subsequently transferred the marital residence to Mr. Stinson by quitclaim deed.

To succeed under 11 U.S.C. §727(a)(2)(A), a plaintiff must prove two distinct elements: (1) a disposition of property, and (2) a "subjective" intent on the debtor's part to hinder, delay or defraud a creditor through the act of disposing of the property. *Id.* at 683. Extrinsic evidence of actual intent to defraud must be submitted to prove a claim under 11 U.S.C. §727(a)(2). *See In re Hamilton*, 306 B.R. 575, 584 (Bankr. W.D.Ky. 2004) citing *Marine Midland Business Loans, Inc. v. Carey (In re Carey)*, 938 F.2d 1073, 1077 (10th Cir. 1991). The Court may infer fraudulent intent from circumstantial evidence. *Id.*

Plaintiffs' argument here is premised upon their belief that the Property Settlement Agreement was so one-sided in favor of Mr. Stinson that it could not have been anything but an attempt by Defendant to defraud her creditors. The Court has reviewed the Property Settlement Agreement and it does indeed provide Mr. Stinson with a majority of the marital assets. Nevertheless, the Court cannot from that fact alone leap to the conclusion that Defendant subjectively intended to defraud her creditors when she accepted the agreement. The Court finds it just as likely that Mr. Stinson, as an experienced businessman, simply drove a harder bargain than Defendant in their divorce and/or took advantage of her illness weakened resolve. It is just as likely that Defendant acted foolishly rather than malevolently in not seeking independent legal counsel during the preparation of the Property Settlement Agreement. Accordingly, Plaintiffs cannot succeed under 11 U.S.C. §727(a)(2)(A) for failure to carry the required burden of proof.

## 11 U.S.C. §727(a)(4)(A)

Similarly, Plaintiffs cannot succeed under 11 U.S.C. §727(a)(4)(A). This section of the Bankruptcy Code requires proof that: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case. *In re Keeney*, 227 F.3d at 685.

Plaintiffs premise their claim under 11 U.S.C. §727(a)(4)(A) on Defendant's failure to complete Defendant's Bankruptcy Papers accurately. Although Defendant's Bankruptcy Papers contained inaccuracies, the Court is persuaded that such inaccuracies were not intended to defraud or otherwise mislead Defendant's creditors. As discussed above, Defendant disclosed all pertinent information to her bankruptcy counsel and relied upon him to complete Defendant's Bankruptcy Papers correctly. Although Defendant should have been more careful in reviewing her counsel's work product before signing the same, such carelessness does not by itself imply fraudulent intent. Furthermore, the deficiencies in Defendant's Bankruptcy Papers are ameliorated by the fact that Defendant's Bankruptcy Papers clearly disclose Defendant's divorce case and Plaintiffs' state court collection proceeding, including the address of Plaintiffs' attorney, and identify Plaintiffs as unsecured creditors.

Because Plaintiffs have failed to establish any fraudulent intent on the part of Defendant, the Court need not consider the other elements of 11 U.S.C. §727(a)(4)(A) and the Court must find in favor of Defendant.

### 11 U.S.C. §727(a)(5)

Finally, Plaintiffs assert that Defendant should be denied a discharge under 11 U.S.C. §727(a)(5) because Defendant has failed adequately to explain the transfer of assets to Mr. Stinson as part of her divorce and the substantially higher valuation of her personal property in her divorce proceeding over the value given in her subsequent bankruptcy case.

Under 11 U.S.C. §727(a)(5), a debtor will be denied a general discharge where the debtor has failed to explain satisfactorily any loss of assets or deficiency of assets to meet the debtor's liabilities. *In re Tapp*, 339 B.R. at 427. The objecting party bears the initial burden of going forward with evidence, which must be more than merely an allegation that the debtor has failed to explain losses. *Id*. Once the objector has introduced some evidence of the disappearance of substantial assets, the debtor must satisfactorily explain what happened. *Id*. To be "satisfactory," an explanation must explain the losses or deficiency in such a manner as to convince the court of good faith and business-like conduct. *Id*. The explanation need not be meritorious to be satisfactory. *Id.* citing *In re Nye*, 64 B.R. 759, 762 (Bankr. E.D.N.C. 1986).

In this case, the Court questions whether Plaintiffs have even met their burden of showing a "disappearance" of substantial assets. Even if Plaintiffs have met their burden, however, the Court

9

concludes that Defendant has adequately explained such alleged "losses."  First, as the Court has discussed above, the transfer of property to Mr. Stinson as part of Defendant's divorce, while appearing unfair, was not so unfair in and of itself as to demonstrate bad faith or a lack of business-like conduct.  Defendant's testimony demonstrates that she simply made the best deal that she thought she could under her circumstances at the time.  That she in hindsight might have made a better deal cannot serve as evidence of bad-faith.  Second, Defendant explained that she valued the personal property received in her divorce on the basis of what she would have had to pay to obtain comparable replacement property and that she valued the same personal property for purposes of her bankruptcy on the basis of what she would get if she sold the same at a yard sale.  While the Court disagrees with Defendant's logic here, the Court finds that Defendant came to her valuations in good-faith and that, therefore, her explanation is adequate for purposes of 11 U.S.C. §727(a)(5).  Accordingly, Plaintiffs' claim under 11 U.S.C. §727(a)(5) must fail.

A separate Order consistent with the foregoing has been entered in accordance with Federal Rule of Bankruptcy Procedure 9021.